**EXHIBIT A**

# Time Charter

## GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 This Charter Party, made and concluded in Hamburg..................................................5th day of March ............................................19 2021

2 Between Messers. NSC Atlantic Trading GmbH & Cie. KG, Hamburg/Germany ...........................................................................as disponent

3 Owners of the good Liberian flag.......................Steamship/Motorship " ALMIRANTE STORNI " See Clause 29 for Vessel's full description of ....

4 of ................................ tons gross register, and ..................... tons net register, having engines of ........................... indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed ......................................................................................

6 at ............................ of about ............................... cubic feet bale capacity, and about .............................................................tons of 2240

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of .......... feet .......... inches on ................ Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about ............................................. tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about ................. knots on a consumption of about.......................tons of best Welsh coal = best grade fuel oil = best grade Diesel oil,

11 now

12 and Messers. Global American Transport LLC, Crain's Communication Building, 28 floor, 150 North Michigan Ave. Chicago as Charterers
of the City of Illinois, 60601, USA

13 Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about a time charter period of about 100 to 130 days trading worldwide, subject to agreed trading exclusions, with lawful, non-dangerous
and non-hazardous cargoes in bulk, always via safe port(s), safe berth(s), safe anchorage(s), safe place(s), safe transit(s), always
afloat (except NAABSA ports), within International Navigating Limits first leg intention Urea from Jubail, Saudi Arabia to Abidjan plus
Nouckchott. Charterers' option to breach INL by paying the relevant premium as per Owners' underwriters actual invoice in line with the
London market. (Please note that vessel is not covered in the London market, but can make it in line with same).

15 ..........................................................................................................................................................within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfilment of this Charter Party. Acceptance of delivery of the Vessel by Charterers shall not constitute any waiver of Owners' obligations
under this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, at on dropping outward pilot Dammam, Saudi Arabia, at any time day or night Sundays

19 and Holidays included.

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5, Vessel on her delivery arrival
first load port to be

22 ready to receive any permissible cargo (See Clause 100) with clean-swept holds and tight, staunch, strong and in every way fitted for the service,
and shall remain so for the currency of this Time Charter having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen according to regulations for a vessel of her tonnage), to be employed,
in carrying lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding see clause 34..........................................................................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports and safe
anchorage (See Clause 37) in British North-

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America ........................................................................................................................................ and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32 ...............................................................................................................................................................................................................

33 ...............................................................................................................................................................................................................

34 ...............................................................................................................................................................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36 1. That the Owners shall provide and pay for all provisions, wages including overtime, immigration and consular shipping and discharging fees
of the Crew; lubricating oils, garbage removal except compulsory which to be Charterers' account but when not compulsory but demanded

by local authorities after inspection to be for Owners account, gangway watchmen for ship unless compulsory and charged under normal port expenses in which case to be for Charterers account, FW except for Hold Cleaning; shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including ~~boiler~~ fresh water and lubricating oil and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service with inspection certificates necessary to comply with safety and health regulations and with current requirements at all ports of call for and during the service.

39  2. That whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Canal Tolls, customary and compulsory Pilotages including but not limited to Bosporus, the Sound, Grenaa and Strait of Magellan, Suez, Panama Agencies (except Agency fees directly related to Owners' items), commissions, customary and compulsory sludge/garbage removal, customary and compulsory watchmen unless ordered by Owners.

40  Consular Charges (except those pertaining to the Crew or flag of the Vessel), and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44  ~~of six months or more.~~

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3.  ~~That the Charterers, at the port of delivery; and the Owners, at the port of re-delivery; shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than ..........................tons and not more than~~

50  ~~.................................. tons and to be re-delivered with not less than ............................. tons and not more than ............................... tons.~~

51  4.  ~~That the Charterers shall pay for the use and~~ hire of the said Vessel at the rate of USD 14,000 per day pro rata including overtime payble every 15 days in advance (see clause 32) ....................................................................

52  .................................................................. ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53  ~~stores, on..........................~~ summer freeboard, as per ~~Calendar Month,~~ commencing on and from the time and day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a ~~day month;~~ hire to continue until the ~~hour~~ time of the day of her re-delivery as per clause 56 in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) ~~at~~ on dropping last outward sea pilot one safe port Jacksonville/Galveston range port in Charterers' option or one safe port NCSA but not east of Puerto Bolivar (Co) port in Charterers' option or one safe port Baltic /Black Sea range including Scandinavia/ UK/ Ireland full Mediterranean excluding Adriatic and Sea of Azov port in Charterers' option or above redelivery ranges to be in Charterers' option, at any time day or night Sundays and Holidays included to apply in all ports

56  ................................................................. unless otherwise mutually agreed. Charterers are to give Owners not less than 15/12/10/7/5/4/3/2/1 days

57  notice of vessels expected date of re-delivery, and probable port.

58  5. Payment of said hire to be made as per Clause 31 in Hamburg, free of any bank charges ~~in New York in cash~~ in United States Currency, fifteen (15) days ~~semi-monthly~~ in advance, and for the last fifteen (15) days ~~half month~~ or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw and/or withhold the vessel from the service of the Char-

62  terers, by giving three (3) days notice without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from~~ ~~7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain or Owners/Manager of the vessel, by the or their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6.  That the cargo or cargoes be laden and/or discharged in any Safe dock or at any safe wharf or place or safe anchorage that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70  lie aground.

71  7.  That the whole reach of the Vessel's Hold, Decks including weather deck and hatch covers, and usual places of loading (not more than she can reasonably stow and carry), also



72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners ................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ **No passengers and no cargo on deck.**

76    8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, and trim, **secure, unsecure, tally, dunnage and discharge** the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80    9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of **USD 15.00** ~~$1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate ~~per meal,~~ for all such victualling. **(see Clause 74)**

86    11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89 sumption of fuel **and RPM of main engine and wind/sea conditions in English.**

90   12. That the Captain shall use diligence in **the care** ~~caring for~~ **custody and** the ventilation of the cargo.

91    13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ........................................................................

92 ............................................................................................................................................................................................

93 ~~on giving written notice thereof to the Owners or their Agents........ days previous to the expiration of the first-named term, or any declared option.~~

94   14. That if required by Charterers, time not to commence before ~~05th March 2021~~ .......................................**Upon lifting subs** and should vessel

95 not have given written notice of readiness on or before **07 March 2021 23:59 hrs** basis local time.................~~but not later than 4 p.m.~~ Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. **For the purpose of computing hire payments, the time for delivery and redelivery shall be adjusted to G.M.T.**

97    15. That in the event of the loss of time from deficiency **and/or default and/or strike** of Crew or Officers **and/or deficiency** of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, **or oil pollution only due to ship's fault,** drydocking for the purpose of examination or painting bottom, or by any other cause **not excepted in this Charter Party**

99 preventing the full **use** working of the vessel, the payment of hire shall cease for the time thereby lost; **all direct extra expenses shall be for Owners account;** and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed **during off-hire** in consequence

101 thereof, any and all **direct related** extra expenses shall be deducted from the hire. **Deductions only made after acceptance from Owners been obtained in writing.**

102    16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106 purpose of saving life and property. **(see Clause 59)**

107    17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~

108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ **The Charter Party shall be governed by and construed in accordance with English Law (see Clause 94).**

110    18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113 might have priority over the title and interest of the owners in the vessel.

114    19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115 Crew's proportion. General Average shall be adjusted, stated and settled **in London,** according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116 York-Antwerp Rules **1994 and any subsequent amendments thereto** ~~1924, at such port or place in the United States as may be selected by the~~

117 carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money.

126        In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
127 whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131 ships belonged to strangers. **Hire is not to contribute to General Average.**

132        Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133        20. ~~Fuel~~ **Bunker** used by the vessel while off hire **to be for Owners account and calculated basis Charterers last purchased price, which to be proven by bunker invoice, unless Owners are required to replace such consumed bunkers themselves in which case Owners will pay directly the relevant bunkers supplied and bunkering** ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 ~~cost of replacing same, to be allowed by Owners.~~

135        ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 ..........................................................................................................................................................................................................................
139 ..........................................................................................................................................................................................................................

140        22. Owners shall maintain the gear of the ship as fitted, providing gear (~~for all derricks~~) capable of handling lifts up **vessel's described maximum capacity.** In case of any aforesaid materials are available onboard, Charterers have free use of same. ~~to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.

145        23. Vessel to work night and day, if required by Charterers, **Owners to provide sufficient lighting on board with ship's lights and light custers to permit night work at all hatches at one and the same time, free of expenses to Charterers,** and all ~~cranes~~ winches to be at
at Charterers' disposal during loading and discharging;
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers.~~ In the event of a disabled **crane or cranes** ~~winch or winches,~~ or
149 insufficient power to operate ~~cranes~~ **winches, the vessel is considered off-hire pro rata on basis of disabled crane/cranes.** Owners to pay for shore **gear engine, or engines, in lieu thereof,** if required, **by Charterers in which case the vessel to remain fully on hire. Owners contribution to shore gear upto maximum daily hire and pay any loss of time occasioned**
150 ~~thereby.~~

151        24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155                                ~~U. S. A. Clause Paramount~~
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160                                ~~Both-to-Blame Collision Clause~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~



162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship; the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.
167          25. The Vessel shall not be required to force ice nor follow icebreakers nor to enter any ice-bound port, or any port where lights or
     light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170          26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, acts or omission or negligence of pilots or tugboats insurance, crew, and all other matters, same as when trading for
     their own account.
172 27. A commission of 2-1/2 1.25 per cent is payable by the Vessel and Owners to HF-Navigator
173 ...............................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2-1/2 3.75 per cent payable to Charterers.........................on the hire earned and paid under this Charter.

Clauses 29 to 106 and Protective Clauses, inclusive as attached hereto, are deemed to be fully incorporated in this Charter Party.


The Owners:                                                The Charterers:


NSC Shipping
GmbH & Co. KG
Hamburg

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

**Clause 29 : Vessel's description**

Time Charter Description

| | |
|---|---|
| Name: | MV "Almirante Storni" |
| Type: | 32.000 DWT Bulk Carrier "Logger |
| Type " Technical Manager: | NSC Shipping GmbH & Cie. KG |
| | Van-der-Smissen- StraBe 9 |
| | 22767 Hamburg |
| | Tel.: +49 (040) 80 80 53-500 |
| | Fax: +49 (040) 80 80 53-800 |
| Yard: | MAWEI SHIPBUILDING LTD |
| Built: | 2012 |
| Flag: | LIBERIA |
| Port of Registry: | MONROVIA |
| IMO-No.: | 9497452 |
| Official-No.: | 91917 |
| Call sign: | A8UN5 |
| Vessels class: | DNV GL |

| | | |
|---|---|---|
| Vessel's dimensions: | LOA: | 177,50 m |
| | LBP: | 168,00 m |
| | Beam: | 28,20 m |
| | Depth (moulded): | 14,20 m |
| | Draft scantling: | 10,00 m |
| | Draft design: | 9,50 m |

| | |
|---|---|
| Deadweight: draft | abt. 31.797,50 mts on 10,00 m scantling draft |
| | abt. 29.550,40 mts on 9,50 m design draft |
| | figures are given on basis of sea water with a specific gravity of 1,025 |
| TPC: | 45,00 mt basis SSW draft of 10.00 m scantling draft |
| Tonnage: | International: 19.994 GT / 10.883 |
| | NT Panama: 16.732 NT |
| | Suez:      18.212,87 NT |
| Main engine: | Mitsubishi YMD-MHI |
| UE Auxiliary Engine: | 3 x MAN 6L 16/24H / |

H.F. Navigator GmbH

**Additional Clauses to the Charter Party
Dated Hamburg, 5ᵗʰ March 2021
MV "Almirante Storni" A/c Global American**

Bowthruster:        NA

Speed/Consumption:

**(Delete Vessel's speed warranties are given below and in case same will not fulfilled, Charterers' can lodge a claim)**

**Laden Condition**

abt 13.50 knots on abt 22.6 mt ifo per day plus
aux abt 12.50 knots on abt 18.0 mt ifo per day
plus aux abt 11.00 knots on abt 14.5 mt ifo per
day plus aux abt 10.00 knots on abt 12.5 mt ifo
per day plus aux **Ballast Condition**
abt 13.50 knots on abt 19.0 mt ifo per day plus
aux abt 12.50 knots on abt 17.0 mt ifo per day
plus aux abt 11.00 knots on abt 13.5 mt ifo per
day plus aux abt 10.00 knots on abt 11.5 mt ifo
per day plus aux

All speed/consumption values are given basis ISO Fuel Standard 8217:2010 RMG380, 380CST

Above speed/consumption are under good weather which is defined as max beaufort force 4 and douglas sea state 3, and no adverse current/negative influence of swell and ISO standard condition.

Fuel oil in accordance with ISO Fuel Standard 8217:2010 RMK380, 380 CST at 50 degrees Celsius

The marine diesel oil supplied to be in accordance with ISO fuel standard 8217:2010 DMZ and the low sulphur content regulations for the Sulphur Emission Control Areas.

Additional consumption at sea for aux. engines: (IFO 380 cst) abt. 2.0 mts/ day aux engines

Additional consumption at sea for boiler:
abt. 1.0 mts/ day boiler consumption (if below 50% MCR = abt 8 knots)

Consumption in port: (IFO 380 cst)
Basis 1 or 2 cranes
abt. 1.7 mts aux engines



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

abt. 1.5 mts boiler Basis 3 or 4 cranes abt. 3.5 mts aux engines abt 1.5 mts boiler

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

The main engine not to be operated below 10% MCR and every two days and within a period of one hour the power to be increased to 60% MCR. Thereafter vessel to steam with minimum 60% MCR for 30 minutes and the power to be decreased to low load again within the following 30 minutes. Slow steaming operation to be performed with due consideration to safe navigation.

Additional consumption of **IFO** for auxiliaries/boiler while sailing with a load less than 50pct MCR and due to increase up to 60 pct ME load every two days.

In case of any technical problems during low load operation, the Master/Owner has the right to increase M/E power above the cut-in point of the aux. blower to avoid any damages to vessels engines.
Vessel is not fitted for cold ironing operations.

**Foul bottom:**

If the vessel speed is reduced as a result of the bottom becoming fouled by reason of the vessel being in port or anchorage for a period in excess of 15 days on hire, the Owners are not to be responsible for reduction of speed and increased consumption due to fouled bottom, Charterers may ask Owners to arrange for a bottom cleaning, for which time and expense to be shared equally between Charterers and Owners.

Holds / Hatches: 5 holds / 5 hatches

Covers:      Trans Folding Type - Lift Away Type double skin
             construction with holes for cement
             Maker: **TTH HUA HAI**

Holds:       Tanktops steel are suitable for grab
             discharge Holds are CO2 fitted
             Vessel is log fitted with 56 collapsible stanchions and 40
             permanent stanchions (7.1 m high)
             Hatches are fitted with permanent
             holes Vessel is grain fitted
             Strengthened for carriage of heavy cargoes in alternate holds:
             Yes — holds 2 and 4 may be left empty

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

Number of holds that may be left slack without requiring bagging/strapping/securing: Holds 2,3 and 4 subject to stability

Holds are fitted with smoke detection system sampling point ONLY Fitted with Australian type approved hold ladders - AMSA former AWWF Non-box shaped holds - vertical structure with upper and lower stool

Single Decker Self Trimming Bulk Carrier with clear/unobstructed/steel floored holds and no pontoon hatch covers - no hand trimming required for bulk cargoes

Hold dimensions:    Length/beam of each tanktop Length/Beam

No 1 23.2m / B 20.0m(aft) / B
5.0m(fwd) No 2 27.0m / 20.0 m
No 3 27.0m / 20.0 m
No 4 27.0m / 20.0 m
No 5 26.2m / B 2.6m(aft) / B 20.0m(fwd)

Hold Capacities:    hold no.              grain/bale

| hold no. | grain/bale |
|---|---|
| 1. | 6,810.6 / 6,470.09 cbm |
| 2. | 9,075.4 / 8,621.61 |
| 3. | 8,999.3 / 8,549.31 |
| 4. | 8,999.3 / 8,549.31 |
| 5. | 8,121.6 / 7,715.57 |

Total grain/bale capacity abt. 42,006.2 / 39,905.89 cbm

| | |
|---|---|
| Tanktop strength: | abt. 20.0 mts/m2 |
| HatchCover strength: | abt. 3.5 mts/m2 for timber |
| loading Deck strength: | abt. 4.0 mts/m2 |
| Cranes: | four single cranes, serving all holds: |
| | 4 x 30 mts lifting capacity basis working range 24m Min. working range 4,20m Cranes outreach beyond ship's rail: 10,00m Grabs or hooks: hooks |
| Tank capacities: HFO: | abt. 1.349 m3 (98 %) |
| MGO: | abt. 137 m3 (98 %) |
| Lub oil: | abt. 98 m3 |

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

| | |
|---|---|
| Fresh Water: | abt. 345 m3 |
| Ballast water: | abt. 9.292m3 |
| | Equipped with anti-heeling tanks |
| | Vessel has double hull with no fuel tanks in double bottom, nor in direct contact with the outer shell. |
| Propeller: | Controllable pitch, with 4 blades solid keyless type Right-handed |
| Bunkers: | Charterers not to comingle different bunker stems in one and the same storage tank, Master will be instructed accordingly. |
| Navigation/ navigation / Communication: | Fitted with all modern nautical aids / satellite weather-chart recorder / Inmarsat system / GMDSS / SAT F All details to be about |

Vessels contacts:

Cpt.Piotr Klimek

Voice: + 88 167 776 7696

Mob: + 49 159 042 88871

Email: master.almirantestorni@SkyFile.com

Inm-C: ALMIRANTE-C1@skyfile-c.com">ALMIRANTE-C1@skyfile-c.com>

Last three ports:

Damamm

(recent) Olvia

Chornomorsk

Last three cargoes:

Granitsand and sugar beet pulp pallets (recent) Timber Concentrates and 1 hold fishmeal

a) Head Owners: MS "Neptune" Schifffahrtsgesellschaft mbh & Co. KG

b) Managers: NSC Shipping GmbH & Cie. KG

c) Disponent Owners: NSC Atlantic trading GmbH & Cie. KG

**Owners warranties/guarantees:**

**- Owners guarantee vessel is and will be in a seaworthy condition at all/any time throughout the duration of this charter-party.**

H.F. Navigator GmbH

### Additional Clauses to the Charter Party
### Dated Hamburg, 5th March 2021
### MV "Almirante Storni" A/c Global American

- Owners confirm that Vessel holds/hatches/tank tops are watertight.

- Charterers are allowed to bunker 2005 specs, in case 2010 specs are not available. Charterers to advise the specs they have agreed to supply prior physical supply. – to be confirmed

- Vessel to be capable of maintaining and to maintain throughout the duration of this Charter Party, on all sea passages under good weather conditions, the speed and consumption mentioned in the vessel's description. Good weather conditions to be defined as per description.

- Vessel on delivery to be without excessive marine growth and in every way capable of performing in line with speed / consumptions as guaranteed. Charterers have the option to conduct underwater survey on delivery to examine vessel's hull condition. Should the survey report confirm marine growth on vessels hull then owners to arrange hull cleaning at next convenient port in their time and cost.

- Vessel can follow Marpol / EU legislation pertaining to fuel sulphur content throughout this Charter Party.

- Vessel is in all respects eligible for trading to the ports, places and / or countries specified in this charter party, and that at all necessary times vessel and / or owners shall have valid certificates, records and other documents required for such trade, including certificate of financial responsibility in compliance with the requirements for charterers calling ports.

- Vessel is on delivery free of Asian gypsy moth.

- Vessel has all space guaranteed suitable for grabs discharge and available in unobstucted clear main holds only. Vessel does not have any horizontal frames/beams obstructions within holds/hatchways as per GA plan and description.

- Vessel is fully suitable for bulldozer discharge (provided that the weight of the bulldozer is within vessel's acceptable tank top strength) - Confirmed but rubber tires only.

- Vessel is fully suitable for and charterers are allowed to perform in transit fumigation always in conformity with international and national regulations.

- That the vessel, its owners and operators are not sanctioned under the u.s., english, european union or swiss economic sanctions laws relating to transactions with restricted countries, persons and entities (the "sanctions laws") and are not listed on the u.s. office of foreign assets control's ("ofac") sdn list, the u.s. bureau of industry and security's ("bis") lists, or the english, european unionor swiss sanctioned party lists;

- That the vessel is not registered by, and the vessel, its owners and operators are not in any way, directly or indirectly owned, controlled by, or related to any cuban, iranian, iraqi, sudanese, north korean, syrian or libyan interests, or to any country, person or entity that may cause gat or a person subject to u.s. jurisdiction to be in violation of or penalized by the sanctions laws; and Vessel not to change registry/name/ownership/flag during C.P., unless with Charterers' prior consent which not to be unreasonably withheld.

- Vessel is suitable for fumigation of cargo in all holds in accordance with current imo and imfo

H.F. Navigator GmbH

### Additional Clauses to the Charter Party
### Dated Hamburg, 5th March 2021
### MV "Almirante Storni" A/c Global American

recommendations;

- Vessels tank top/floor to be free of obstacles and Vessel to be suitable for grab/pneumatic discharge and use of bobcat - As per ga plan and description

- Vessel flag of: Iran / Iraq / Cuba/ Syria/ Libya/ Russian federation/ North Korea - is not allowed;

- Russian federation company within entire CP chain/string of performer Vessel - is not allowed.

- During last 10 vessel port calls shall not be any from the following list: Cuba, Libya, Syria, Iran, North korea;

- Vessel has all space guaranteed suitable for grab discharge and available in unobstructed clear main holds only; - as per ga plan and description

- Vessel does not have any horizontal frames/beams obstructions within holds/hatchways  -   As per ga plan and description

- Vessel is grain certified with grain booklet / certificate on board.

- Vessel is fully fitted for the carriage of grains without any bagging, strapping, securing, lashing;

- Vessel is and will be in a seaworthy and cargo worthy condition during entire duration of this charter-party. Unless caused by charterers

- The Vessel to be min 3stars rightship approved charterers to check rightship rating themselves

- Vessel can load/discharge all ho/has simultaneously with all cranes/grabs if any running at the same time

- Equipped with hatch covers which are in perfect working order and waterproof;

- Vessel officers/crew are fully covered by proper CBA / ITF. Or equivalent

- Shall be covered by a first class P&I club (part of the international group) without any conditions affecting cover and remain so throughout the whole duration of this cp.

- Classed Lloyds + 100a1 or equivalent (IACS class).

- The vessel is fully P&I, hull + machinery insured;

- Vessel has not changed class recently (within the last 24 months).

- Vessel has not been detained recently (within last 24 months) – To be advised

- There are no class recommendations pending.

- Vessel shall not change name/flag/ ownership/managers/ class/pandi during currency of this cp. Subject to Charterers approval which not unreasonably withheld

Page 8 of



H.F. Navigator GmbH

### Additional Clauses to the Charter Party
### Dated Hamburg, 5th March 2021
### MV "Almirante Storni" A/c Global American

- Vessel shall at all time be available and allow Charterers to carry out a full condition survey/inspection of the vessel (prior to and during the currency of this CP) at Charterers ' time and expense.

- The last psc inspections (over the past 3 reports) do not record deficiencies which may have an impact on the cargo/seaworthiness of the vessel.

- The Vessel has not been involved in any general average issue within the last 3 (three) years.

- Owners confirm the possesion of valid certs according to latest Solas regulations.

- Owners confirm that Vessel has all valid docs/certs available on board for a draft survey;

- Owners confirm that Vessel is not blacklisted for load-discharge countries/ports and is suitable for this trade;

- Owners confirm that Vessel is ISM /ISPS fitted;

- Owners to agree that charterer's nominated representative is free to board the proposed vessel at any time to verify the replies to the above questions, condition of cargo and entries of logbook on board but always in compliance with ship / port ISPS procedures; confirmed if allowed suring the present covid 19 pandemic

- Vessel is complying with all rules, restrictions, and regulations at load/disch ports, and enroute, in terms of load/carriage/disch of named cgo and has on board all relevant valid certificates;

- Owners confirm that mentioned commodity have not been carried by performing vessel during last 18 months: slaughter waste, processed animal proteins, animal manure, skins and waste treated with tanning extracts, garden soil / compost treated with animal material, toxic oxidative materials and packaging thereof, radioactive material, asbestos or materials of asbestos content, mineral clay used for detoxification, glass and glasscullets, asphaltgranulate, peanuts(pellets), processed animal proteins (fishmeal, mammalianmeat & bonemeal, etc; - Vessel carried one hold of fishmeal 5  months ago otherwise ok

- They have not knowingly loaded Iranian or Iranian blended bunkers from any port that remain on the vessel at time of delivery that would be in breach of Eu regulation 267/2012 in particular but not confined to article 11 and annex iv.

- Owner to warrant that the vessel is not blacklisted nor boycotted by any country in the Arab league.

- Vessel / owner is not in anyway affected by Eu/US/Swiss sanctions whatsoever.


Clause 30: Bunkers
Bunkers expected on delivery as on board to be about 625 MTs VLSFO and about 80 MTs LSMGO.

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

Bunkers on redelivery to be about same quantities as on delivery, Charterers on delivery and Owners on redelivery to take over bunkers remaining on board at Platt's price quoted for the for the port of delivery/redelivery.

Should no price be available for the respective port/date, nearest to be taken.

Both "BIMCO 2020 Fuel Transition Clause for Time Charter Parties" and "BIMCO 2020 Marine Fuel Sulphur Content Clause for Time Charter Parties" to apply, which please see at the end of the Additional Clauses.

**Clause 31: Owners Bankers**
In Favour of:    NSC Atlantic Trading GmbH &
Cie. KG Bank:
Account No.:
BLZ:
IBAN:
SWIFT:

**Clause 32: Charter Hire**
**Hire USD 14,000- per day pro rata, including overtime payable every 15 days in advance.**

**First hire and bunker payable within three banking days after Vessel's delivery and Charterer's receipt of Owners' hire statement via email.**

**Clause 33: Residue Disposal**
Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

**Clause 34: Cargo Exclusions**
Max 8 dirties out of sulphur, salt, petcoke, coal to be allowed during this charter but not as last cargo but 2 consecutive voyages are allowed. No Scrap, Cement and Cement Clinker allowed.

Petcoke Protective Clause
A) Petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous non- oily type.
B) If Charterers exercise such option, Charterers undertake to use holds as less as possible, provided vessel's stability/trim and stress permit.
C) Such cargo to be loaded/stowed/trimmed/discharged strictly in accordance with latest IMO regulations/recommendations.
D) Before loading, all holds assigned for petcoke are to be washed down by fresh water and then hold block OR LIME WASH applied by Charterers at their time/expense/risk to the entire satisfaction of the Master and independent surveyors appointed by Charterers'. In case Charterers ask, vessel's crew to perform the hold blocking OR LIME WASH, materials and equipment to be provided by Charterers, crew to effect same at Charterers' time and as servants to Charterers and Charterers to pay US$ 800 per hold as crew bonus. Petcoke cleaning and application kit always to be supplied by Charterers.'



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5ᵗʰ March 2021**
**MV "Almirante Storni" A/c Global American**

Sulphur Protective Clause

A)  Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permit.

B)  Before loading, all holds assigned for sulphur are to be washed down by fresh water and then hold block or lime wash applied by Charterers at their time/expense/risk to the entire satisfaction of the Master. In case Charterers ask, vessel's crew to perform the hold blocking OR LIME WASH, materials and equipment to be provided by Charterers, crew to effect same at Charterers' time and as servants to Charterers and Charterers to pay US$ 800 per hold as crew bonus. Cleaning and application kit always supplied by Charterers and at Charterers' expense.

C)  Cargo is to be loaded/stowed/trimmed/discharge strictly according to the latest IMO and/or any other latest regulations/rules applicable to such cargo.

D)  All fresh water used for irrigation onto sulphur during loading/voyage/discharging to be for Charterers' account.

Salt Protective Clause

(A)  Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting;

(B)  Before loading all holds assigned for salt to be applied hold block or lime up to minimum 4 meters from bottom (at least 1 meter higher than the height of cargo) by Charterers, at their time / expense / risk to satisfaction of master which not to be unreasonably withheld. Such cargo to be in dry condition. In case Charterers ask, crew to perform the hold blocking or lime wash at Charterers' time and expenses and as servants to Charterers. After discharging, crew to perform hold blocking or lime washing removal / cleaning of holds, Charterers paying US$ 750 per hold used ILOHC as crew bonus and all materials/equipment will be for Charterers' account.

The bonus is only for removing the hold block or lime. Application is to be done by Charterers at their expense.

(C)  Cargo to be loaded / stowed / trimmed / discharged strictly according to latest **IMO** regulations / recommendations.

(D)  All fresh water used for irrigation onto salt during loading /voyage /discharging to be for charterers' account.

(E)  Any extra expenses resulting therefrom/incurred thereby (such as hold cleaning to master's satisfaction/hold survey etc.) And any detention through any of above causes to be for charters account.

A - Acids, aluminium ashes, aluminium ferrosilicon, aluminium ferrosilicon powder UN 1395, aluminium silicon powder, aluminium smelting buy/products, ammonia, ammonium chloride, ammunition, andalusite, animals, arms, asbestos goods, ashes, asphalt and or its products, ammonio chlorine, automobiles, ammonium sulphate max 2 cargoes to be allowed provided of normal fertilizer grade, but chilean nitrate to be allowed.

B - Bank notes or other negotiable instruments, battery, battery scrap, benzine, bitumen, blasting caps and powder, black powder, bleaching powder, bombs, bones or bone meal, briquettes, brown coal and brown coal briquettes, bone meal, borax, boycotted cargoes, bullion.

C — Calcined pyrites, calcium carbide, calcium chloride, calcium floride, calcium hypochlorite, calcium hyperchloride, calcium oxide, calcium oxychloride, calcium nitrate UN 1454, camping caravans, canary

Page **11** of

H.F. Navigator GmbH

**Additional Clauses to the Charter Party
Dated Hamburg, 5th March 2021
MV "Almirante Storni" A/c Global American**

seed, carbide, castor beans, castor meal, castor pomace, castor flak UN 2969, castor seeds, caustic soda, caustic potash, chemical wastes, chipped bone, chilean potassic mixture, chilean shaltpetre, clay, combustible, copra, copra products, corrosive, cotton and cotton waste, cotton seed expellers, creosote and creosoted goods, chrome cake, coconut, coffee, cement, contraband of war, caustic soda

D — Damaged or secondhand goods, dangerous injurious and inflammable goods, dichiorphenol, direct reduced iron in any form, iron swarf, iron oxide, direct reduced iron (briquettes, hot-moulded), direct reduced iron (lumps, pellets, cold-moulded briquettes), hot briquetted iron, detonators, detonator caps, dynamite, drugs.

E — Esparto, explosives, essential oils

F — Ferrous meal, ferrous metal, ferrous metal borings, ferrous metal cuttings, ferrous metal shavings, ferrous metal turnings, fibres, firearms, fire briquettes, fireworks, fish meal, fishscrap, flour, ferro silicon,

G - gasoline, glass, gluten feed pellets, granite blocks, groundnuts.

H — Hot briquette iron, hemp, hides, hot and cold moulded briquettes, hypochloride solutions.

I — Iron briquettes, iron ore swarf, iron carbide/oxide spent, iron swarf, isotopes, industrial

waste J — Jute

K —

L — Lime (unslacked), livestock, locomotives, lorries.

M — Magnesia, magnetitem magnesium nitrate, manioc, manioc pellets, meal oily, metal sulphide, military equipment, mobile homes or caravans, motor blocks, motor spirit, motor vehicles, manioc and manioc pellets, macoya, metal borings and cuttings

N — Naphtha, nefeline, niger seeds, niger seed expellers, nikel ore, nitrate of soda, nuclear and radioactive materials or products or fuels or cargo or wastes, nitroglycerine.

O — Oily pieces, oil palm kernells, oily cake, oily scrap, old rails, organic peroxides, oilcake

P — Paper products, pencil pitch in bulk or in drums, pitch prill, pesticides, petroleum derivatives and all petroleum products, pitch, prefabricated houses and mobile buildings/homes, pollard pellets, potassium chloride, sodium nitrate, prefabricated houses, pond coal, poultry, pre-reduced iron pellets, peat moss, pond solid

Q — Quebracho, quebracho extract, quicklime

R — Radio isotopes, rags, radioactive substances or wastes of any kind, products or waste, railway wagons, rare metals and precious objects, raw vegetables or fruit, refrigerated cargo, refuse and garbage of any kind, resin, rice bran, resin scrap, rockets.



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

S — saltpetre, savings metal borings and cuttings, sawdust, silicon, sintered ores, sludge ore, solvents, spent oxides, sponge iron, sodium/potassium nitrade, sodium sulphate, specie, sulphate, swat syanite ore pellets, seeds/seed cake, sinter feed, silica sands, scrap, sunflower seed and expellers,

T — Taconite, tankage, tankage fertilizer, tar, tar and all its products, tea, tobacco, t.n.t., toxic, toxic or chemical waste, turnings, turpentine.

V — Vanadium ore, vermiculite, vehicles

W - War material of any kind, waste and old paper, wet hides, wheat middling

pellets Y — Yellow phosphorus

Z — Zinc dross and residues and all its products.

California Block Stowage (C.B.S.) is not allowed.

- Brazilian cabotage Bills of Ladings to be allowed

In accordance with Brazilian fiscal regulation it is mandatory the issuance of the Brazilian electronic bill of lading, namely, ct-e, for Brazilian coastal trade (cabotage). The total responsibility to issue, keep and distribute of ct-e it is of the Charterers/sub-charterers who are empowered/authorized by Brazilian authorities to issue such electronic document according to Brazilian law in force. All clearance of the cargo is provided by electronic system interconnected with port authorities. Regarding original bill of lading, an auxiliary transport printed document of the electronic document, e.g., dacte (in Portuguese), is available on completion of loading operation and can be sent to owners/master upon request.

In view of Charterers requiring the issuance of the Brazilian document for maritime transportation (ct-e), Charterers indemnify Owners, Owners servants and agents and hold Owners harmless in respect of all damages, losses, expenses, claims or liabilities which may be incurred as a result of Charterers issuing cabotage electronic bills of lading.

Cargo to be discharged against Charterers Letter of Indemnity as per Owners P & I Club wording in case Bills of Lading are not available at discharge port.
Vessel to be able to perform Argentinean and Brazilian cabotage as well as non-wheat/iron ore trades, trades between Brazil and Argentina and Argentinian And Brazilian cabotage voyages with Charterers to apply for flag waiver.

Loading steel cargoes: Steel cargoes to be sufficiently dunnaged/lashed/secured and nlashed/unsecured at Charterers expense, risk, in their time and responsibility by stevedores up to Master's satisfaction. Owners opt to appoint their P&I surveyor to carry out a pre-loading survey for finished steels products and cost of same to be shared equally by Owners and Charterers provided such service is charged by P&I against receipt of scanned copy of original invoice.

Deck cargo to be allowed with the following wording:
'Charterer's option to load cargo on deck and/or hatch covers which to be loaded in accordance with the vessel's stability, seaworthiness and strength under the master's supervision, but always at Charterers' / shippers' time, risk, expenses and responsibility. The master and crews to give Charterers all their utmost efforts and reasonable cooperation's to load cargo on deck. Bills of lading for such cargo shall be

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

marked 'Cargo shipped on deck at shippers' risk and responsibility and without any responsibility of the vessel or her Owners whatsoever'.

Charterers will be responsible for any damages of the deck structure caused by cargo on deck which have resulted from charterers order for loading on deck.'

**Clause 35: Agents**
Charterers undertake to keep Owners informed during the periods as regards the itinerary of the vessel and the name of their Agents at ports of call. Owners may utilize the services of Agents appointed by the Charterers for Owners' minor matters such as crew change, cash to Master and Charterers shall authorise their Agents to attend such request. Charterers shall settle such amount together with hire payments. If fees are charged by Agents for handling husbandry matters, same to be for Owners' account.

**Clause 36: U.S. Security**
If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures: Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

**Clause 37: Trading Limits**
Trading Exclusions:

Trading worldwide always via safe port(s) / berth(s) / anchorage(s), always afloat / always accessible within International Navigating Limits always excluding:

Abkhazia, Albania, Amazon River TO BE ALLOWED, Angola (including Cabinda), Cambodia, CIS TO BE ALLOWED/PLS SEE BELOW PROTECTIVE CLAUSE, Congo, Cuba, Djibouti, Eritrea, Ethiopia, Faroe Islands, Federal Republic of Serbia and Montenegro, Georgia, Great Lakes, Greenland, Gulf of Aden, Haiti, Honduras, Iceland, Iran, Iraq, Lebanon, Libya, Myanmar, Namibia, New Zealand*, Nigeria (but Lagos to be allowed), North Korea, Orinoco River TO BE ALLOWED, Qatar, Sea of Azov, Sierra Leone, Somalia, Sudan, Syria, Tasmania, Turkish occupied Cyprus and no direct calls to Turkey after calling Cyprus, Ukraine TO BE ALLOWED (provided ecological fines to be paid by Charterers), Venezuela, Yemen, Zaire and countries / areas banned / sanctioned by United States, United Nations and / or European Union, areas defined as epidemic areas by World health Organizations, war / warlike / ice zones.

No ice trading, nor following ice breakers.

The vessel not to be operated in Australian coastal trade nor to be operated in Cabotage trade.

Vessel not to be ordered to/from Taiwan directly after or prior calling People's Republic of China or vice versa.
Any ports affected by Asian gypsy

moth. CIS protective clause:

H.F. Navigator GmbH

**Additional Clauses to the Charter Party
Dated Hamburg, 5th March 2021
MV "Almirante Storni" A/c Global American**

Charterers shall have the option to call CIS Pacific ice-free ports during the currency of this Charter Party. Charterers to arrange and issue at their time and expense the AGM Certificate for trading USA / Canada plus for any other courtiers that may in the future introduce requirement for AGM Certificate. Vessel to be redelivered AGM free.

The vessel not to trade through or nearby a contaminated with radiation zone or area which being declared by the national and / or international authorities such as but not limited to the International Atomic Energy Agency (IAEA), the World Health Organization (WHO), the "Bundesamt fur Strahlenschutz", Nuclear and Industrial Safety Agency (NISA) or the International Maritime Organization. English law / Arbitration London.

New Zealand:
'Charterers to have the option to call NZ, for which Owners' approval not to be unreasonably withheld. Charterers furthermore will arrange at their time and costs all measurements to make the vessel fit in line with governing environmental regulations.

Australian Cabotage Trade:
"The vessel is not intended to trade in Australia cabotage trade. If, however under Australian law the vessel is considered to be undertaking Australian cabotage trade then Charterers are to pay to Owners any extra crew wages as are necessary and in line with Australian regulations. Charterers furthermore will arrange at their time and costs all measurements to make the vessel fit in line with Australian environmental regulations."

**Clause 38: Crew works**
Whenever the crew is working for / assisting the Charterers, crew are to be considered as Charterers servants. Such works only to be rendered if permitted by local and/or port regulations and/or shore labour.

The hire under this charter party shall be deemed to include customary crew assistance including but not limited to:

- Preparation/operating, Rigging, raising and lowering of derricks/cranes/grabs/gear Opening/Closing of hatches.

Bunkering operations/Bunker measurements Fitting and dismantling of grain fittings/cargo battens.

Supervision of stowage Berthing, un-berthing, shifting, sailing, warping, securing lines Hold preparation and cleaning - as far as physically possible

The crew will endeavour to perform all works within the time frame given by Charterers, as far as physically possible, safety permitted.

**Clause 39: Suez and Panama Canals Tonnage Certificates**
Throughout the period of the Charter vessel shall have on board current valid Suez and Panama Canal tonnage Certificates and will so comply with all applicable requirements, regulations and recommendations so as to avoid any delay in transit of Canals. Any extra port expenses assessed because of vessels age or flag shall be for Owners' account.



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5ᵗʰ March 2021**
**MV "Almirante Storni" A/c Global American**

Any delay due to non-compliance or any lack of proper documentation or equipment according to vessel's specifications is to be treated as off hire and any expenses incurred thereby to be for Owners' account.

In the event that time is lost in Owners obtaining any necessary licenses or permits or similar documents from any authority for Owners' own account, same shall be treated as off hire and any direct related extra expenses shall be for Owners' account.

Time lost due to lack of licenses/permits/documents of vessel is for Owners' account, time lost due to lack of licenses/permits /documents of cargo is for Charterers' account.

**Clause 40: Calling at U.S. Ports**
It is understood that the vessel has full bunkering privileges at U.S. ports.

The vessel to have USCG Certificate of Financial Responsibility as necessary to comply with the Oil Pollution Act 1990 obligations or any subsequent amendments.

Owners confirm that Vessel is suitable for trading USA and Canada.
If voyage schedule includes calls in US ports entire crew to hold valid US visa for time in US waters / ports.

**Clause 41: War Risk Insurance**
Any additional war risk insurance premium including blocking and trapping over and above Owners' basic/normal war risk insurance premiums for vessel and crew, if any, resulting from Charterers' trading of the vessel to be for the Charterers' account. War bonus to crew and kidnap and ransom premium, if required to meet Charterers' trade, also to be for Charterers' account. The vessel shall not be required to proceed to a war risk area without Owners' prior consent at first, which not to be unreasonably withheld and unless insurance is available on payment of an additional premium and unless permitted by country of vessels registry. The CONWARTIME 2013 or latest amendment to be considered as part of this Time Charter Party.

Any additional war risk premiums payable by Charterers always to be less of no Claims bonuses / rebates etc. and only against original vouchers.

The extra war risk insurance quotes would be submitted to Charterers for their approval/consent which not be unreasonably withheld.

**Clause 42: Bill(s) of**
**Lading Deleted**

**Clause 43: Intermediate Hold Cleaning**
On completion of discharge of each cargo, vessel's crew shall render customary assistance in cleaning cargo holds in preparation for next cargo, if required by Charterers and if not prevented by shore regulations. Such cleaning to be performed while vessel is en route to next loading port provided that this can be safely done, weather permitting, crew as servant to Charterers and that the duration of the voyage is sufficient. Charterers shall pay US$ 500 per hold actually cleaned such cleaning will be done as best as possible but without
guarantee that cargo holds will be sufficiently cleaned and accepted on arrival at loading port. Owners shall not be responsible for any consequences arising from the fact that the vessel's crew has been

Page **16** of



H.F. Navigator GmbH

### Additional Clauses to the Charter Party
### Dated Hamburg, 5th March 2021
### MV "Almirante Storni" A/c Global American

employed in cleaning. Any equipment required for cleaning, additional to what is on board, to be supplied and paid by Charterers. This Clause to apply only for cargoes where no cleaning within the protective Clause is agreed.

#### Clause 44: Arrest

Should the vessel be arrested during the currency of this Charter Party at the suit of any party having or purporting to have a claim against or any interest in the vessel, hire under this Charter Party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal and any consequential expenses whatsoever shall be for Owners' account, unless such arrest is due to action against Charterers or sub-Charterers or their Agents or the Contractors or the cargo Shippers or Consignees.

#### Clause 45: Log Abstracts

Master is to forward promptly to Charterers completed log abstracts and port logs in English on the Charterers' forms as provided by the Charterers for both deck and engine for each passage.

#### Clause 46: Dry-Docking

No dry-dock during the currency of this Charter Party except in case of emergency.

#### Clause 47: Cargo Claims

Cargo claims shall be settled in accordance with the Inter Club New York Produce Exchange Agreement of September 1996 and any subsequent amendments.

#### Clause 48: Idling and maritime growth
#### clause Deleted

#### Clause 49: Stevedore Damage

Stevedores to be appointed and paid by the Charterers but to work under the supervision of the Master. Should any damage be caused to the vessel or her fittings by the Stevedores, the Master has to try to let Stevedores repair such damage and try to settle the matter directly with them. In case Owners do not succeed in obtaining direct settlement from Stevedores, the Charterers shall be responsible for covering stevedore damages.

(1) The Master shall hold the party causing damage responsible in writing and do his utmost to obtain their acknowledgement or responsibility.

(2) Owners or the Master shall notify the Charterers and/or its agency per telex or cable or telefax or e- mail with details of damage within 12 hours after occurrence.

(3) Owners or the Master shall notify the Charterers and/or its agency per telex or cable or telefax or e- mail with details of hidden damage within 12 hours damage ascertained or prior vessel is next time empty.

(4) In case more than superficial damage caused to the Vessel Owners to discuss with the Charterers as to whether survey by independent survey to be carried out prior to vessels' departure.

(5) Damages affecting vessel's class and/or seaworthiness to be repaired immediately in Charterers' time and at Charterers expenses under the supervision of Vessels Class Surveyor. Vessel to remain on-hire.



H.F. Navigator GmbH

## Additional Clauses to the Charter Party
### Dated Hamburg, 5th March 2021
### MV "Almirante Storni" A/c Global American

(6) For damages not affecting sea worthiness, Charterers have option to redeliver vessel without repairing against lumpsum settlement which to be mutually agreed between Owners and Charterers.

### Clause 50: Insurance for Hull and Machinery

Owners warrant that the vessel is covered by a reputable first-class insurance for hull and machinery and shall remain fully insured throughout the terms of the Charter.

Hull and machinery value: US$ 13.010.000

### Clause 51: P & I Club

Owners confirm to have entered vessel into a P and I club for cover in respect of all conventional protection and indemnity risks subject to applicable reasonable deductions.

Owners P & I club: North of England

Charterers confirm to have entered into a P & I club for cover in respect of conventional protection and indemnity risk including Time-Charters' liabilities.

Charterers P & I club: To be advised

### Clause 52: BIMCO Sanctions Clause for Time Charter Parties

(a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c) 'The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

(d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

The present Clause applies until release of the new Clause wording, which is expected beginning of December 2019.

### Clause 53: Financial Responsibility in Respect of Pollution

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

If Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place or territorial or contiguous waters of any country or state in performance of this Charter Party, Owners shall meet such requirements at Owners' expense.

**Clause 54: Redelivery condition of holds**
Charterers to pay on redelivery a lumpsum of USD 5,000.00 in lieu of hold cleaning including removal and disposal of dunnage, debris, lashing materials, etc if any.

**Clause 55: Last Hire Payments**
Should the vessel be on her voyage to the port of redelivery at the time when payment of hire is due, said payment shall be made for such length of time as Owners or their Agents and Charterers or their Agents may agree upon as the established time necessary to complete the voyage. Bunkers to be taken over by the Vessel and estimated disbursements for Owners' account before redelivery to be taken into account and when the vessel is redelivered any difference shall be refunded by Owners or paid by Charterers as the case may be.

Charterers have the right to deduct from the last sufficient hire payments reasonably estimated Owners' disbursements upto maximum US$ 10.000 unless the estimated amount is higher and estimated bunkers remaining on board on redelivery.

**Clause 56: Time Zone for Hire Payments**
For the purpose of computing hire payments, the time of delivery and redelivery shall be adjusted to reflect the GMT.

**Clause 57: Clause Paramount and Others**
Clause Paramount, new Both to Blame Collision Clause, new Jason Clause, CONWARTIME 2013 as attached hereto are to be considered part of this Time Charter party and same are to be incorporated into the Bills of Lading issued hereunder.

**Clause 58: Metric Tons**
Wherever tons are referred to in this Charter Party, same are understood to be metric tons, unless otherwise stated.

**Clause 59: Deviation**
Vessel has the liberty to deviate for the purpose of saving life and/or property and to tow or assist vessel(s) in distress. Such operations not to be deemed a deviation under this Charter Party, but all salvage attribution thus payable to the vessel to be equally divided with Charterers, after proper deduction of expenses, if any, including Captain's and crew's shares incurred in this respect.

**Clause 60: Bunker**
If bunkers supplied do not conform with the specifications or otherwise prove unsuitable for burning in the Vessel's engine and/or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences and therefore, the Charterers shall be responsible for any proven/direct damage and direct/proven consequences resulting from subject bunkers.

**Clause 61: laying up**

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

The Charterers shall have the right to order the laying up of the vessel at safe port at any time and for any period of time and give the Owners at least thirty (30) days advance notice. In the event of such lay up the Owners shall take prompt steps to effect all the economies in operating costs including insurance which may be possible and give prompt credit to the Charterers in respect of all such economies. Any cost and expenses resulted from her backing normal trade from the lay-up to be for Charterers' account. Charterers waive any claim to deterioration of the speed and consumption.

At the request of the Charterers at any time the Owners shall furnish an estimate of the economies which would be possible in the event of a lying up of the vessel.

**Clause 62: Bunker Fuel Sulphur Content Clause**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub- clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone, and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 63: Compliance with International Convention**
In the event of the vessel being prevented from or unable to perform in accordance with the terms of this Charter Party by reason of:

a) Action on the part of relevant authorities resulting from non-compliance with any compulsory applicable enactments enforcing all or part of any of the International Convention in force.

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

b) Labour stoppages in services essential to the Operation of the vessel owing to her flag or Ownership or management or the conditions of employment on board.

Any loss of time in the event a) and/or b) shall result in the vessel being off-hire and shall be dealt with in accordance with the off-hire clause.

Vessel to be delivered with valid deratization certificate on board and same to remain valid throughout the currency of this Charter Party.

**Clause 64: I.T.F. Clause**
The Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew of the vessel are now or will be prior to presentation of the vessel for delivery and will remain for the period of this Charter Party covered by an I.T.F. agreement or a bona fide Trade Union agreement acceptable to the I.T.F.

In the event that the vessel is delayed by reason of boycotts, strikes, labour stoppages or other actions by the I.T.F. against the vessel due to employment conditions, time so lost shall be considered as off hire and costs directly resulting therefrom are to remain for Owners' account.

**Clause 65: Hamburg Rules**
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading or Waybills whether or not signed on their behalf or on behalf of the Owners voluntarily incorporating the Hamburg Rules or any legislation under which the Hamburg Rules are compulsorily applicable in respect of any contract of carriage under or during the period of this Charter or any Sub-Charter.

In the event that the Owners sustain a liability arising from the application of the Hamburg Rules in circumstances where those rules were not compulsorily applicable and where the Owners would not otherwise have sustained a liability.

**Clause 66: Charterers' Inspection**
Charterers to have the Option to hold an inspection of the vessel before delivery at any time without interfering with the progress of the vessel's construction, at their risk and expense. Charterers may inspect the vessel at any time between delivery and redelivery, at their risk and expense.

In all cases Owners and Master to give every facility and assistance to carry out this inspection.

**Clause 67: Sales Clause / Flag Change**
 Deleted

**Clause 68: War Cancellation**
In the event of war between/among U.S.A. U.K. Russia, The People's Republic of China, France and Japan directly affecting Vessel's trading under this Charter Party, both parties shall mutually discuss as to cancel or continue this Charter Party.

**Clause 69: Guaranteed Speeds and Consumption**
The Owners stipulate that the Vessel is capable of maintaining and shall remain capable of maintaining throughout the period of this Charter Party on all sea passages from sea buoy to sea buoy guaranteed

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5ᵗʰ March 2021**
**MV "Almirante Storni" A/c Global American**

speeds and guaranteed daily consumptions as described in Clause 29. The period during which the vessel performs under the following conditions shall be excluded from performance calculations.

a) Any time during which speed is deliberately reduced to comply with Charterers orders/ requirements.

b) Any time during which the Vessel's speed is deliberately educed for reasons of safety while navigating within narrow waters having due regard to Vessel's size and draft or when assisting a vessel in distress or when saving life or property.

c) Any completed sea passage of less than twelve (12) hours.

Unpremeditated stops not due to weather and sea conditions at sea shall be counted as off-hire in full and shall be excluded from total hours at sea when calculating the average speed. For manoeuvring in restricted waters and for manoeuvring in and out of ports, the vessel burns Diesel Oil.

**Clause 70: Smuggling**
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account, if caused by Charterers and/or persons appointed by Charterers, and to be for Owners' account if caused by Owners, Officer and/or crew and/or persons appointed by Owners.

**Clause 71**
Deleted

**Clause 72: Release of Cargo without Bill of Lading**
**The Charterers to ensure the presentation of the original duly endorsed bills of lading at discharging port(s) prior to Vessel's arrival. If the original bills of lading are not available by the time of the Vessel's arrival at port of discharge the Owners should allow to discharge / deliver the cargo without presentation of the original bills of lading against Charterers' letter of indemnity (hereinafter as "LOI") issued in Owner's P&I club form and wording together with the copy of signed bills of lading.**

**Clause 73: Communication with Crew**
The Master, Chief Engineer and all deck officers, including the Boatswain are to be able to speak and understand English (verbal/written) including the documenting of the logbook entries, Mates Receipts and any other usual document will be done in English.

If the Master or Officers cannot communicate fluently in the English language, then the Charterers to have right to request replacement of Master and officers.

**Clause 74: Communication/Victualling/Entertainment**
Charterers to pay a lumpsum of USD 1,500.00 per 30 days or pro rata for victualling and communications.

**Clause 75: BIMCO Ship to Ship Transfer Clause**
(a) The Charterers shall have the right to order the Vessel to conduct ship to ship cargo operations, including the use of floating cranes and barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.

Page **22** of



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5ᵗʰ March 2021**
**MV "Almirante Storni" A/c Global American**

(b) The Charterers shall direct the Vessel to a safe area for the conduct of such ship to ship operations where the Vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Charterers shall provide adequate fendering, securing and mooring equipment, and hoses and/or other equipment, as necessary for these operations, to the satisfaction of the Master.

(c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the Vessel or to remove the Vessel.

(e) If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred.

(f) The Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the Vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, floating cranes or barges, loss of or damage to cargo; and pollution.

**Clause 76: BIMCO EU Advance Cargo Declaration Clause**
(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:

(i) Have in place an EORI number (Economic Operator Registration and Identification);

(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and

(iii) Where the cargo is being:

1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or a re-export notification is not required, an exit summary declaration, or

2. Imported: Submit, or arrange for the submission of, an entry summary declaration. Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

**Clause 77**

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5ᵗʰ March 2021**
**MV "Almirante Storni" A/c Global American**

Deleted

**Clause 78: Tax Clause**
a) At loading and/or discharging port(s) any taxes and/or dues on cargo to be for Charterers' account and any dues and/or taxes on vessel and/or freight/hire and/or flag to be for Owners' account.

b) U.S. Tax Reform 1986 Clause
Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99 — 514, (as referred to as the U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this Charter Party which begins or ends in the United States, and which income under the Laws
of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

**Clause 79: Survey Clause**
Owners and Charterers are to hold a joint on-hire and off-hire survey for joint account, on-hire survey to be on Owners' time and off-hire survey to be on Charterers' time. The cost of such survey to be equally shared by Owners and Charterers. On-hire survey to be held at delivery port and off-hire survey to be held at last port of discharge.

**Clause 80: U.S. Trade — Unique Bill of lading Identifier Clause**
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed within a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4 Section 4. 7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

**Clause 81: Drugs**
Upon vessels delivery to Charterers in the event that prohibited drugs are found in cargo, equipment or other property loaded by Charterers, their servants or agents, or are found on the person or in possession of or effects of Charterers, servants or agents, Charterers shall remain responsible for all and any consequential fine and expenses including the detention of the ship. The ship shall not go off-hire as a result of the presence of the drugs, whether this be real unless such delay or detention is directly attributed to the Owners, Master or crew.

**Clause 82: BIMCO Solid Bulk Cargoes that Can Liquefy Cl.**
(a) The Charterers shall ensure that all solid bulk cargoes to be carried under this Charter Party are presented for carriage and loaded always in compliance with applicable international regulations, including the International Maritime Solid Bulk Cargoes (IMSBC) Code 2009 (as may be amended from time to time and including any recommendations approved and agreed by the MO).

(b) If the cargo is a solid bulk cargo that may liquefy, the Charterers shall prior to the commencement of loading provide the ship's Master, or his representative, with all information

Page **25** of



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

and documentation in

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

accordance with the WISBC Code, including but not limited to a certificate of the Transportable Moisture Limit (TML), and a certificate or declaration of the moisture content, both signed by the shipper.

(c) The Owners shall have the right to take samples of cargo prior to loading and, at Charterers' request, samples to be taken jointly, testing of such cargo samples shall be conducted jointly between Charterers and Owners by an independent laboratory that is to be nominated by Owners. Sampling and testing shall be at the Charterers' risk, cost, expense and time. The Master or Owners' representative shall at all times be permitted unrestricted and unimpeded access to cargo for sampling and testing purposes.

If the Master, in his sole discretion using reasonable judgement, considers there is a risk arising out of or in connection with the cargo (including but not limited to the risk of liquefaction) which could jeopardise the safety of the crew, the Vessel or the cargo on the voyage, he shall have the right to refuse to accept the cargo or, if already loaded, refuse to sau l from the loading port or place. The Master shall have the right to require the Charterers to make safe the cargo prior to loading or, if already loaded, to offload the cargo and replace it with a cargo acceptable to the Master, all at the Charterers' risk, cost, expense and time. The exercise by the Master of the aforesaid rights shall not be a breach of this Charter Party.

(d) Notwithstanding anything else contained in this Charter Party, all loss, damage, delay, expenses, costs and liabilities whatsoever arising out of or related to complying with, or resulting from failure to comply with, such regulations or with Charterers' obligations hereunder shall be for the Charterers' account. The Charterers shall indemnify the Owners against any and all claims whatsoever against the Owners arising out of the Owners complying with the Charterers' instructions to load the agreed cargo.

(e) This Clause shall be without prejudice to the Charterers' obligations under this Charter Party to provide a safe cargo. In relation to loading, anything done or not done by the Master or the Owners in compliance with this Clause shall not amount to a waiver of any rights of the Owners.

**Clause 83: Grab Discharge Clause**
Owners guarantee that the vessel and all her holds are suitable for grab loading/discharge. Vessel's holds/hatches to be clear and free from any and all obstructions and suitable in every respect for grab loading/discharge. No bulk cargo to be loaded in any place not suitable for discharge by means of mechanical grabs.

**Clause 84**
Deleted

**Clause 85: Deviation Due to Accident/Breakdown**
Should the vessel be put into any port other than those instructed by the Charterers by reason of accident or breakdown or for the purpose of landing any injured or sick Officers including Master, or members of the crew, the port charges, pilotages and any other expenses including bunkers and loss of time shall be borne by Owners also, should the vessel be put back whilst on voyage by way of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is again the same or equidistant position and the voyage resumed therefrom.

**Clause 86**
Deleted

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

**Clause 87: Gangway/Watchmen**
Gangway/watchmen, if any, at loading and/or discharging port to be for Owners' account, if however, shore gangway watchmen are compulsory by port or local regulations, then costs to be for Charterers account.

**Clause 88**
Deleted

**Clause 89: Delays**
Any delays and/or other expenses/consequences resulting from any strikes, lock-outs, slow goes of pilots, tugboats, any shore labour or any of Charterers servants including but not limited to linesmen, stevedores, agents, transport workers etc., port authorities, customs and any other government bodies/servants shall be for Charterers account unless caused by Owners.

**Clause 90: BIMCO Stowaway Clause for Time Charters**
(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii)    Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

**Clause 91: Sanctions Clause for Time Charter Parties**
Deleted — See Clause 52.

**Clause 92: Ocean Routes Service**
**The Charterers may supply an independent weather routing advise to the master during voyage specified by Charterers, however the final decision as to route selection and the navigation of the Vessel will be master's choice. If Charterers elect to supply weather routing, the Owners will have the option to appoint their own weather routing company. Evidence on weather conditions to be taken**

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

from Vessel's log abstracts and Charterers / Owners weather routing companies. In the event of consistent discrepancy between the log and the routing companies with PECA report from two independent weather route companies

**Clause 93: Drawing and Plan**
Master/Owners to supply Charterers with the General Arrangement and Capacity Plan, bearing displacement and deadweight scale of the vessel latest upon arrival at the first port.

**Clause 94: BIMCO Dispute Resolution Clause**
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply: -

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when
allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

**Clause 95: BIMCO Piracy Clause for Time Charter Parties 2013 (amended)**

(a) Deleted

(b) Deleted

(c) If the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group (including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub- clause (d)(iii).

(d) Costs

(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime K&R.

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety- first (91st) day after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the equivalent of Charter Party hire, for any time lost in making good any damage and deterioration resulting from the seizure. The Charterers shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

**Clause 96: Prohibition of Lien Clause**
The Charterers will not suffer, nor permit to be continued any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of Owners in the vessel. in no event shall Charterers procure, or permit to be procured, for the vessel, any supplies, necessaries or services using their best efforts to obtain a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the vessel or of her Owners, and that the furnisher claims no maritime lien on the vessel therefore.

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

**Clause 97: Bulk Carrier Safety Clause**
(a) The Charterers shall instruct the terminal operators or their representatives to co-operate with the Master in complying the IMO ship/shore safety checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding and provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factors which may affect the safety of the vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop loading or discharging.

**Clause 98: Private and Confidential**
All negotiations and fixture to be kept strictly private and confidential.

**Clause 99: Bunkering and Sampling Clause**
The Charterers shall supply fuels of the specifications and grades as agreed. The fuels shall be of a stable and homogeneous nature and unless otherwise agreed in writing, shall comply with ISO standard 8217:2005 or any subsequent amendments thereof.

(a) The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuelsuppliers during bunkering. Such cooperation shall include connecting/disconnecting hoses to the vessel's bunker manifold, attending sampling, reading gauges or meters or taking soundings, before, during and/or after delivery of fuels.

(b) During bunkering a primary sample of each grade of fuels shall be drawn in accordance with IMO Resolution MEPC.182(59) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with the Revised MARPOL 73/78 Annex VI or any subsequent amendments thereof. Each primary sample shall be divided into four (4) samples; one sample of each grade of fuel shall be retained on board for MARPOL purposes and the remaining samples of each grade distributed between the Owners and the bunker suppliers.

(c) The Charterers warrant that any bunker suppliers used by them to bunker the Vessel shall comply with the provisions of Sub-clause (b) above.

(d) Bunkers of different grades, specifications and/or suppliers shall be segregated into separate tanks within the Vessel's natural segregation. The Owners shall not be held liable for any restriction in bunker capacity as a result of segregating bunkers as aforementioned.

**Clause 100: Hold Condition**
**Vessel on her delivery at the first load port shall be free of reminants and residues of all prior cargoes and to be clean swept and washed down by water and dried up so as to be ready to receive, in all respects, any permissible cargo, also free of salt and rust scale. If Vessel fails to pass any hold/hatch inspection/test then the Vessel shall be placed off-hire from the time of rejection until she passes the same hold/hatch inspection/test again and directly related expenses incurred shall be for Owner's account.**

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

**Clause 101**
**The Master shall sign clean bills of lading for cargo as presented in conformity to mates receipts. However the Charterers or their agents may sign bills of lading on behalf of the master with the masters prior written authority always in strict conformity with mates. "Congenbill" latest edition to be used, marked 'clean on board' against an LOI and 'freight payable as per Charter Party' or freight prepaid" in Charterer option. In Charterer option shore scale figures or draft survey figures to be inserted on the bills of lading**

**Master has the right to reject damaged/unsound cargo, which is to be replaced by Charterers/shippers at their time and expense. However such option not to be unreasonably exercised.**

**If second set / splitted / switch bills of lading requested by the charterers, owners / agent to issue against surrender of first set of bills of lading or charterers simple 'LOI' in Owners' P&I wording but always without endorsed by bank. Anyhow second sets of bills of lading can only be issued in exchange with the olds bills of lading always and upon owners collection of the old full set original bills of lading duly cancelled. At no time two sets of bills of lading are to be in circulation. Charterers to surrender first set to Owners nominated agents office.**

**Clause 102: Hose Test**
Owners guarantee that vessel's hatch covers are watertight/weathertight and will remain in such condition during the time charter period and if any hatch cover is found defective it will be repaired immediately at Owners' time and expense.

Charterers have the right to carry out a hose/chalk test on all/any hatches prior loading or after discharging, during the charter period at Charterers' time and expense by a surveyor appointed by charterers. The results of such survey/inspection/test will be binding to both parties. If vessel fails to pass such hose/chalk test, the vessel will be placed off hire and all directly related expenses to be for Owners' account until the vessel successfully passes the next hose/chalk test. Charterers to have the option to carry out an ultrasonic test.

In case ultrasonic inspection fails, Owners to have the option to appoint a joint P&I surveyor for conducting hose test and such result to be binding to both parties. Any time loss/expenses due to vessel passing the joint hose test to be on charters account. Any time loss/expenses due to vessel failing the joint hose test to be on owners account.

**Clause 103: Co-stowage**
Charterers option to weld steel plates and/or fastenings thereto to the ship's frames but not on top/side of fuel tanks and hoppers, subject in any event to the Master's /Class's approval which not to be unreasonably withheld, with materials and in a manner always in accordance with local regulations and, if required, approved by local authorities. Such work to be arranged and undertaken at Charterer's time, expense, cost, risk. All such work to be carried out under the Master's supervision and subject to any/all ship's strength, stability and safety criteria. The Charterer's shall remove all materials associated in any way with the aforementioned work to the Master's satisfaction prior to redelivery of the ship. Any damage, associated in any way with the aforementioned work, to vessel's hull, structure, fixtures and fittings, including but not limited to paint coating, shall be repaired/restored to the Master's satisfaction prior to redelivery of the ship.



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

Relevant spaces to be repainted in line with vessels standards.

**Clause 104: Interclub Agreement**
**Liability to third parties for cargo claims shall be shared by the Owners and the Charterers in accordance with inter club New york produce exchange agreement dates 2010 or amendments thereto. Any cargo claim should immediately reference to the other party with supporting documents for negotiation**

**Clause 105: Off Hire Time Charter period Extension**
It is agreed that in case there are any off-hire periods during the currency of this charter party, Charterers are entitled to extent the agreed time charter period beyond the maximum period including
+15 days.

**Clause 106: Prolonged Off Hire**
If the vessel remains off hire for at least forty-five (45) days in total, Charterers will be entitled to terminate the charter and redelivery the vessel back to her Owners unless she is with cargo onboard, in which case, it is Charterers' option that the vessel is redelivered back to Owners at the next available port/berth/anchorage where all cargo has been discharged.

**BOTH-TO-BLAME COLLISION CLAUSE**
"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

**NEW JASON CLAUSE**
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

**Clause Paramount**

Page **31** of

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such Legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.

**ISPS Clause for Time Charter Parties**
(a)
(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)
(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners". (ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)
If either party makes any payment which is for the other party' s account according to this Clause, the other party shall indemnify the paying party.

**NAABSA Clause**
The Charterers shall have the right, but only at (River Plate) where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to lie aground at a safe berth/place/anchorage for loading and/or discharging of cargo and/or bunkering but only on soft mud and provided vessel on even keel and not falling completely dry and where vessel is not to be asked to manoeuvre whilst aground.

It is expressly agreed that the Master shall have the right to refuse to allow the vessel to lie aground if in his reasonable written opinion, it is not safe to do so.

The Charterers shall indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

In case the vessel actually lied aground. Owners to order local - accepted by the Class - divers for a hull inspection at the respective port in Charterers' time and for Charterers' expense to ascertain vessel's hull/propeller/rudder condition. In case this operation cannot be performed in the port the incident happened due to visibility or other reasons, same to be performed in the next possible port in Charterers' time and for Charterers' expense.

**BIMCO U.S. Anti-Drug Abuse Act 1986 Clause for Time Charter Parties 2013**
In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire. Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.



H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

**BIMCO U.S. Security Clause for Time Chartering 2002**
If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. **BIMCO**

**U.S. Tax Reform 1986 Clause**
Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

**BIMCO Asian Gypsy Moth Clause for Time Charter Parties 2015**
(a) The Owners shall deliver the Vessel free of Asian Gypsy Moth (AGM). If the Vessel has within the last twenty-four (24) months prior to delivery traded to an area where there is a risk of infestation by AGM, the Owners shall, on delivery, provide an inspection certificate stating that the Vessel is free from infestation by AGM issued by an appropriate and recognised certification body (an AGM Free Certificate) dated no earlier than the date of departure from the last port of call in such area.

(b) Should the Charterers order the Vessel to an area where there is a risk of infestation by AGM, the Charterers shall take all reasonable steps at their expense to mitigate the risk of infestation. If infestation should nevertheless occur, the Charterers shall ensure that such infestation is removed from the Vessel. Without prejudice to this obligation, the Charterers shall provide an AGM Free Certificate from the last port of call in the aforementioned area. Notwithstanding the issuing of such a certificate, should an infestation of AGM be found or suspected, the Charterers shall be responsible for any consequences whatsoever, including but not limited to costs and third party liabilities. The Vessel shall remain on hire throughout.

(c) The Charterers shall redeliver the Vessel free of AGM. If the Vessel has traded to an area where there is a risk of infestation by AGM the Charterers shall, on redelivery, provide an AGM Free Certificate dated no earlier than the date of departure from the last port of call in such area.

**BIMCO 2020 Fuel Transition Clause for Time Charter Parties**
**(a) Definitions**

For the purpose of this Clause:

"Carriage Ban Date" means 1 March 2020.

"Carriage Ban" means the prohibition of the carriage for use of Non-Compliant Fuel as of the Carriage Ban Date.

H.F. Navigator GmbH

**Additional Clauses to the Charter Party**
**Dated Hamburg, 5th March 2021**
**MV "Almirante Storni" A/c Global American**

"Compliant Fuel" means any fuel that meets the Sulphur Content Requirements with effect from the Effective Date.

"Effective Date" means 1 January 2020.

"Non-Compliant Fuel" means any fuel with a sulphur content of more than 0.50%.

"Sulphur Content Requirements" means any sulphur content and related requirements as stipulated in MARPOL Annex VI (as amended from time to time) and/or by any other applicable lawful authority.

**(b) Requirements**
(i) Before the Effective Date, the Charterers shall have supplied the Vessel with fuel so that on the Effective Date the Vessel shall have sufficient Compliant Fuel to reach the nearest bunkering port where Compliant Fuel is available.

(ii) No later than the Carriage Ban Date there shall be no Non-Compliant Fuel carried for use by the Vessel.

Together subclauses (b)(i) and (ii) are the "Requirements".
Notwithstanding the Carriage Ban, Owners and Charterers shall cooperate and use reasonable endeavours so that no later than the Effective Date there shall be no Non-Compliant Fuel carried for use by the Vessel.

**(c)** (i) In order to meet the Requirements, the Charterers shall at their risk, time and cost ensure that any Non-Compliant Fuel remaining on board after the Effective Date shall be discharged from the Vessel's bunker tanks until such tanks are free of liquid and pumpable fuel latest by the Carriage Ban Date or the redelivery date of the Vessel, whichever occurs first; and

(ii) in respect of the bunker tanks that are free of liquid and pumpable fuels, Owners shall at their risk, time and cost ensure that such tanks are fit to receive Compliant Fuel, taking into account the type of Compliant Fuel that will be loaded into such bunker tanks.

Compliant Fuel shall not be loaded into a Vessel's bunker tanks until the steps described above in subclauses (c)(i) and (c)(ii) have been carried out in respect of such bunker tanks.

Once bunker tanks are fit in accordance with subclause (c)(ii), no Non-Compliant Fuel shall be loaded into such bunker tanks.


**(d) Disposal of Non-Compliant Fuel** - In respect of Non-Compliant Fuel, if any, which needs to be discharged from the Vessel in accordance with subclause (c)(i), Charterers shall dispose of such fuel in accordance with any applicable local regulations at Charterers' risk, time and cost.

**(e) Segregation** - Unless otherwise agreed between Owners and Charterers, each supply of Compliant Fuel shall be bunkered into empty tanks within the Vessel's natural segregation.

**BIMCO 2020 Marine Fuel Sulphur Content Clause for Time Charter Parties**

Page **35** of

H.F. Navigator GmbH

### Additional Clauses to the Charter Party
### Dated Hamburg, 5th March 2021
### MV "Almirante Storni" A/c Global American

(a) For the purpose of this Clause, "Sulphur Content Requirements" means any sulphur content and related requirements as stipulated in MARPOL Annex VI (as amended from time to time) and/or by any other applicable lawful authority.

(b) The Charterers shall supply fuels to permit the Vessel, at all times, to comply with any applicable Sulphur Content Requirements. All such fuels shall meet the specifications and grades set out in this Charter Party.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers shall comply with the Sulphur Content Requirements.

The Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all losses, damages, liabilities, delays, deviations, claims, fines, costs, expenses, actions, proceedings, suits, demands arising out of the Charterers' failure to comply with this subclause (b), and the Vessel shall remain on hire throughout.

(c) The Owners warrant that the Vessel shall comply with the Sulphur Content Requirements.

Subject to the Charterers having supplied the Vessel with fuels in accordance with subclause (b), the Charterers shall not otherwise be liable for any losses, damages, liabilities, delays, deviations, claims, fines, costs, expenses, actions, proceedings, suits, demands arising out of the Owners' failure to comply with this subclause (c).

*****

**The Owner:**                                        **The Charterer:**





Page 36 of